# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SERENIC SOFTWARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PROTEAN TECHNOLOGIES, INC., | ) | |
| and VANXAY KITNIKONE, | ) | |
| | ) | Case No. CV 04-415-S-LMB |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| PROTEAN TECHNOLOGIES, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| v. | ) | |
| | ) | |
| SERENIC SOFTWARE, INC., | ) | |
| | ) | |
| Counterdefendant. | ) | |
| ———————————————— | ) | |

Currently pending before the Court are Plaintiff's/Counterdefendant's Motion for
Summary Adjudication of Counts One, Two, and Three of the Protean Counterclaim (Docket
No. 65), Plaintiff's/Counterdefendant's Motion for Summary Adjudication on Liability
Regarding Claims of Misappropriation of Trade Secrets and Breach of Contract (Docket No. 68),
Defendants'/Counterclaimants' Motion for Partial Summary Judgment (Docket No. 84),
Defendants'/Counterclaimants' Alternative Rule 56(f) Motion for Continuance (Docket No. 88),
and Defendants'/Counterclaimants' Motion to Augment (Docket No. 110).  Having carefully

**MEMORANDUM DECISION AND ORDER -1-**

reviewed the record, considered oral arguments of counsel, read the parties' legal memoranda, and otherwise being fully advised, the Court enters the following order.

# I.

## BACKGROUND

This action between Defendants Protean Technologies, Inc. ("Protean") and Vanxay Kitnikone (either "Kitnikone" or collectively "the Defendants") and Plaintiff Serenic Software, Inc. ("Serenic"), at essence, is whether either party misappropriated the other's trade secrets or breached an agreement entered between the parties.

On September 5, 2000, Protean and Serenic entered into their Partner Agreement ("Agreement"). *Kitnikone Affidavit*, Ex. A (Docket No. 84-3). At that time, Protean was in the business of reselling computer software and Serenic had developed fund accounting software (Serenic 2.60) to expand the application of Navision, an accounting software owned by Microsoft Corporation, to not-for-profit and governmental organizations ("NG Market"). *See Malik Declaration*, ¶ 8 (Docket No. 72). Serenic 2.60 uses "granules" which contain specific accounting applications for use with Navision. *See id.* at ¶ 11; *First Alexander Declaration*, Ex. 15, p. 2 (Docket No. 78-2). Without a product like that created by Serenic, Navision is not easily usable in the NG Market. Accordingly to the record, Serenic committed two years, 10,000 hours, and over $700,000 (excluding marketing, sales, and company overhead) to develop its product. *Malik Declaration*, ¶¶ 19, 20, 21, & Ex. 2 (Docket No. 72).

Serenic sells its software directly and also uses other companies to sell its software. The Partner Agreement with Protean allowed Protean to market Serenic's software in the NG Market. The Partner Agreement was in effect for approximately two years until, on June 12, 2003, Protean served notice on Serenic that it was terminating the Agreement. *Answer &*

*Counterclaim*, ¶ 28 (Docket No. 8).  Prior to giving this notice, Protean had developed and conducted demonstrations of its competing product, ProVision.  *See First Alexander Declaration*, Ex. 7, at p. 7; Ex. 8 at p. 6; Ex. 10 at p. 2 (Docket Nos. 76-2, 76-3, 76-5).  Protean commenced sales of ProVision on April 24, 2003.  *Id.*  Serenic asserts that Protean developed its software by using trade secrets provided by Serenic during the parties' relationship, and this assertion is the basis for Serenic's breach of contract and trade secret misappropriation claims.

On July 29, 2003, shortly after Serenic received Protean's notice of termination, Serenic filed for arbitration with the American Arbitration Association ("AAA").  *First Alexander Declaration*, Ex. 17 (Docket No. 78-4).  According to the record, an arbitrator granted summary judgment in favor of Serenic on Protean's counterclaim for breach of the covenant of good faith and fair dealing.  *Id.* at Ex. 19 (Docket No. 80-2).  After this decision was entered, Protean failed to pay its portion of the arbitration fees that were due and the AAA subsequently suspended the arbitration proceedings.  *Id.* at Ex. 20 (Docket No. 80-3).  These facts form the basis for Serenic's claim that Protean breached the Partner Agreement by failing to complete arbitration as required by the Agreement.[1]

Also at issue are Defendants' counterclaims alleging that Serenic (1) breached the covenant of good faith and fair dealing implied in their agreement "by deliberately undercutting [Protean's] proposals and interfering with its attempts to market [Serenic's] fund accounting software product . . . and competing directly with [Protean];" (2) violated the Idaho Trade Secrets Act "by misappropriating [Protean's] confidential information, namely the Stars interface system;" and (3) breached the Partner agreement "by misappropriating [Protean's] confidential

---

[1]  Serenic also asserted claims for negligent misrepresentation and fraudulent concealment, but these claims have been dismissed pursuant to a stipulation.  (*See* Docket No. 102).

**MEMORANDUM DECISION AND ORDER -3-**

information, namely the Stars interface system." *Answer & Counterclaim*, p. 11 (Docket No. 8).

Serenic has moved for summary judgment on three of its claims and on all of Protean's counterclaims and Defendants have requested partial summary judgment on three of Serenic's claims.  Defendants also have requested a Rule 56(f) continuance of these proceedings and augmentation of the January 5, 2006 Order (Docket No. 58) resolving the parties' motions to compel.

## II.

## MOTIONS FOR SUMMARY JUDGMENT

**A.**     **Standards of Law**

Federal Rule of Civil Procedure 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is required if the nonmoving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he/she will bear the burden of proof at trial.  *See Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986).  If the nonmoving party fails to make such a showing on any essential element of his case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.  *See also* Fed. R. Civ. P. 56(e).

In order to preclude entry of summary judgment, an issue must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the litigation.  An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to

require a jury or judge to resolve the parties' differing versions of the truth at trial," *First Nat'l Bank v. Cities Serv. Co., Inc*., 391 U.S. 253, 289 (1968), or when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). *See also British Motor Car Distribs., Ltd. v. San Francisco Auto. Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

**B.     <u>Governing Law</u>**

The Partner Agreement provides that it "shall be governed by and construed in accordance with the laws of the location of Serenic's headquarters, which is presently located in the state of Colorado." *Kitnikone Affidavit*, Ex. A, § 11.1 (Docket No. 84-3). Both parties agree that Colorado Law applies to interpret the Agreement and, thus, cases from Colorado courts will be cited and relied upon in relation to the contract claims.

With respect to the trade secret claims, both parties agree that there is no conflict between Idaho's Trade Secret Act ("ITSA") and the Colorado statute. Because there is no apparent conflict of law, and because Plaintiff's trade secret claim is brought under Idaho's Trade Secret Act, Idaho's Act will be considered in evaluating the trade secret claims.

**C.     <u>Serenic's Trade Secret and Contract Claims Based on Alleged Misappropriation</u>**

Serenic argues that Protean used Serenic's fund accounting software to produce a competing product called ProVision, which "has the same look, style and feel of Serenic 2.60, together with all of the key functionalities contained in Serenic 2.60." *Complaint*, p. 4, ¶ 15 (Docket No. 1). These facts form the basis for both Serenic's misappropriation claim and its breach of contract claim. Serenic also relies upon the Partner Agreement that contains a clause providing that "the parties agree to maintain the confidentiality of the Confidential Information and to protect as a trade secret any portion of the other party's Confidential Information. . . ."

**MEMORANDUM DECISION AND ORDER -5-**

*Complaint*, Ex. 1, ¶ 8.2 (Docket No. 1).  All parties seek summary judgment on these claims.[2]

**(1)      The Trade Secrets**

It is well established that "[i]n order to prevail in a misappropriation action under the

ITSA, the plaintiff must show that a trade secret actually existed."  *Basic Am., Inc. v. Shatila*,

133 Idaho 726, 734, 992 P.2d 175, 183 (1999); *see also Imax Corp. v. Cinema Techs., Inc*., 152

F.3d 1161, 1164 (9th Cir. 1998).  In Idaho, trade secret "means information, including a formula,

pattern, compilation, program, computer program, device, method, technique, or process, that . . .

[d]erives independent economic value, actual or potential, from not being generally known to,

and not being readily ascertainable by proper means by, other persons who can obtain economic

value from its disclosure or use."  Idaho Code § 48-801(5)(a).[3]

Serenic describes its trade secrets to include: "the screens, the tables, the design, the

architecture, the functionality, and perhaps segments of code."  *Cameron Affidavit*, Ex. 2, p. 26

(Docket No. 84-7); *see also Malik Declaration*, ¶¶ 9, 11, 12, 13-15, 18 (referring to the

"solutions," "innovation," and "logic" of Serenic's product).  Defendants argue that Serenic has

failed to establish that these "enhancements, which it markets and sells to the public, are

secrets."  *Memorandum on Defendants' Motion for Partial Summary Judgment*, p. 6 (Docket No.

84-2).  In addition, Defendants argue, "[i]n other words, information that is generally known or

readily ascertainable cannot be a trade secret."  *Id.*

---

[2]  Serenic has not sought summary adjudication of the amount of damages, but only as to liability.

[3]  Colorado defines a trade secret as "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value."  C.R.S. § 7-74-102(4).

**MEMORANDUM DECISION AND ORDER -6-**

In support of this argument, Defendants point out that Serenic's president, Jay Malik, testified at his deposition that he does not "believe the concepts and ideas are trade secrets." *See Cameron Affidavit*, Ex. 1, p. 62, ls. 11-12 (Docket No. 84-5). However, Mr. Malik also testified that the trade secrets would be the technical design that underlies the concepts or enhancements. *Id.* at p. 62, ls. 13-16. Thus, according to Serenic, it is the design, logic, and architecture of Serenic's product that may be a protected trade secret and Serenic's claim that Protean used this information is supported by the expert report and testimony of Shirley Fowler.

Fowler declared that Serenic has "15 specific areas of functionality and applications that distinguish its product in the market place," and "Protean has replicated these functionalities." *Fowler Declaration*, ¶ 7 (Docket No. 73). Fowler's expert report states that "Protean's underlying design . . . is virtually the same as the design Serenic had developed," *First Alexander Declaration*, Ex. 15, p. 3 (Docket No. 78-2); *see also id.* at p. 10, and she explains in her Declaration that, in some instances, "the underlying code" shows that Protean's "objects have been configured in a near identical manner," *Fowler Declaration*, ¶ 8 (Docket No. 73). Fowler also opines that Protean's design "matches" a "major design feature" of Serenic's product. *First Alexander Declaration*, Ex. 15, p. 6 (Docket No. 78-2).

In addition, Fowler identified some Graphical User Interface ("GUI") imperfections in Protean's screen "which were early imperfections in the Serenic Navigator object." *Id.* at p. 33. She opines that "[t]here are a few GUI issues which really stand out and make it obvious that these screen shots both came from Serenic Navigator: no gaps top and left, too-small gaps between bottom and right, the Posting Date textbox is not wide enough, and the Comments textbox is extremely wide." *Id.* at p. 35.

Fowler also testifies that her report "supports the conclusion that there is strong evidence

MEMORANDUM DECISION AND ORDER -7-

of direct copying by Protean of parts of the Serenic 2.60 product," "strongly supports the conclusion that Protean has replicated each of the key Serenic functionalities and that Protean has implemented them in a very, very similar manner." *Fowler Declaration*, ¶ 8 (Docket No. 73). She also opined that "it would be very difficult and time-consuming for a developer, who did not have access to source code and to the tables, architecture, layouts and functionalities to produce or to replicate the Serenic 2.60 functionalities in the same manner . . . within the timeframe claimed by Protean."[4] *Id.* at § 9.

For purposes of the pending motions, Fowler's opinions provide information relevant to the Restatement of Tort's test for determining whether a trade secret exists.[5] States that have adopted the Uniform Trade Secrets Act, such as Idaho has, "often apply factors from the Restatement [of Torts § 757, comment b] in order to facilitate application of the tests [for a trade secret] embodied in the statute." *Basic American*, 133 Idaho at 735, 992 P.2d at 184. The factors in comment (b) address the issue of whether information is generally known or readily ascertainable, and include:

> (1) the extent to which the information is known outside [the plaintiff's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the

---

[4] Documents in the record indicate that Protean commenced work on ProVision on January 13, 2003 and that it demonstrated its product as early as March 13, 2003. *See First Alexander Declaration*, Exs. 8, 9, 10 (Docket Nos. 76-3, 76-4, 76-5).

[5] "The current Restatement definition of 'trade secret' is even broader than that incorporated in the Uniform Trade Secrets Act: 'A trade secret is any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others.'" *Basic American*, 133 Idaho at 734 n.2, 992 P.2d at 183 n.2 (quoting Restatement (Third) of Unfair Competition § 39 (1995)).

> information; and (6) the ease or difficulty with which the
> information could be properly acquired or duplicated by others.

*Id.*

Fowler's report provides information relative to the ease or difficulty of duplicating the information, and Jay Malik's Declaration explains the amount of effort and money expended to develop Serenic's product, describing that Serenic took approximately two years[6], 10,000 hours, and over $700,000 (exclusive of marketing, sales, and company overhead) to develop its product. *Malik Declaration*, ¶¶ 19, 20, 21, & Ex. 2 (Docket No. 72). *See also, e.g.*, *Basic American*, 133 Idaho at 735, 992 P.2d at 184 (trial court considered that the plaintiff had "expended substantial [time,] effort and expertise in developing and commercializing the Trade Secret, and that it would take substantial effort and expense for others to duplicate the alleged trade secret"); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (noting that the architecture of plaintiff's product could not be readily duplicated without the secret information acquired by plaintiff through years of research). With respect to the value of the information, Malik states that, to his knowledge, no company had developed a comprehensive, industry-specific application for the NG Market prior to Serenic doing so. *Malik Declaration*, ¶ 9 (Docket No. 72); *see also id.* at ¶¶ 10, 12, 16.

Defendants also argue that they are entitled to summary judgment on Serenic's trade secret claim because "the alleged trade secrets are the very product that [Serenic] markets and sells to the public" and therefore cannot be protected as a secret. *Memorandum on Defendants' Motion for Partial Summary Judgment*, pp. 7-8 (Docket No. 84-2). Serenic contends that it

---

[6] The two-year timeframe starts from the conception of the Navigator project and includes the time during which improvements were made, up to January of 2003. *Malik Declaration*, ¶ 8 (Docket No. 72).

**MEMORANDUM DECISION AND ORDER -9-**

markets only its final product, it does not sell the product's source code, design, or architecture. Thus, for purposes of the pending motions, even if the idea behind the software is not secret, the design, architecture, and logic of the software is kept secret.

Other courts have determined that this type of information, when not generally accessible to the public, may be protected. *See, e.g.*, *Integrated Cash Management*, 920 F.2d at 171, 173 (upholding trial court's determination that the "architecture" of plaintiff's product or the way in which the product's "various components fit together as building blocks in order to form the unique whole," was a protectable trade secret where the central question presented was "whether trade secret protection extends to the manner in which several non-secret utility programs are arranged to create a computer software product"); *Q-CO Indus. v. Hoffman*, 625 F. Supp. 608, 617 (S.D. N.Y. 1985) (explaining that "a trade secret can exist in a combination of characteristics, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a competitive advantage and is a protectable secret") (citation and internal quotation marks omitted)).

There is evidence in the record that Serenic took steps to maintain the secrecy of its product design and architecture, including requiring employees and other partners in selling its product to execute confidentiality agreements and including a statement in every source code object to remind its partners that every object they access is considered to be confidential information. *See Malik Declaration*, ¶¶ 15, 17-18 (Docket No. 72). Additionally, Serenic "include[s] a confidentiality provision in the license with the end-user of [Serenic's] product." *Id.* at ¶ 17. Thus, Serenic's information was, for purposes of the pending motions, "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Idaho Code § 48-801(5)(b).

**MEMORANDUM DECISION AND ORDER -10-**

(2)      **The Alleged Misappropriation**

To prevail on its motion, Serenic must also demonstrate that Defendants misappropriated

its trade secrets.  *See* Idaho Code § 48-801 (defining misappropriation).  With respect to this

requirement, it appears to the Court that genuine issues of material facts exist.  Defendants have

submitted evidence into the record that they did not use Serenic's trade secrets to produce

ProVision.  Particularly, Jody Leoni of Protean instructed Protean employees to "not download

or view the Serenic Navigator version 3.6," and wrote in an email, "[a]lthough we have

discussed this previously, I would like to reiterate how important it is to steer clear of the Serenic

product as a whole – even version 2.6" when developing ProVision.  *First Alexander*

*Declaration*, Ex. 12 (Docket No. 76-6).  Additionally, Ron Summers, a former Protean employee

and a lead developer of ProVision, testified that, although he does not recall a formal process or

review to prevent Protean employees from using Serenic's code, "periodically [employees] were

reminded throughout the process to not be using the code."  *Id.*, Ex. 29, p. 15, 42 (Docket No.

83-5).[7]

However, when "a defendant uses a plaintiff's trade secret as a 'starting point' for new

formulations or processes" that may be evidence of misappropriation.  *Basic American*, 133

Idaho at 741, 992 P.2d at 190.  *See also id.* (quoting *American Can Co. v. Mansukhani*, 742 F.2d

314, 328-29 (7th Cir. 1984) (explaining that a "party may not use another's trade secret, even

with independent improvements or modifications, so long as the product or process is

substantially derived from the trade secret" and that "[i]f the law were not flexible enough to

---

[7]   On the other hand, William Hart, another Protean employee, testified that he was not
aware of any emails saying "Don't look at Serenic's code.  Don't look at Serenic's designs . . . ,"
nor did he have any discussions along these lines with anyone at Protean in 2003.  *First*
*Alexander Declaration*, Ex. 24, pp. 85-86 (Docket No. 82-4).

**MEMORANDUM DECISION AND ORDER -11-**

reach such modifications, trade secret protection would be quite hollow")).  Protean had access

to Serenic's product and the report of Shirley Fowler indicates Protean created a very similar

product.

In summary, after carefully considering the evidence in the record, the only conclusion

that can reasonably be reached is that there exist genuine issues of material fact with respect to

whether Defendants used Serenic's product to develop its competing product.  Although Serenic

has produced evidence that Protean may have used Serenic's design, architecture, logic, etc., to

develop ProVision, in order to grant summary judgment on this issue would require weighing

evidence, resolving factual disputes, and making credibility determinations, none of which are

appropriate on summary judgment.

For all of these reasons, and because genuine issues of material facts exist, neither party

is entitled to summary judgment on Serenic's trade secret and concomitant breach of contract

claim.[8]  Rather, those are factual issues that must be resolved by the trier of fact.

### (3)    Personal Liability of Defendant Kitnikone

In its second and third causes of action based on the alleged breach of the parties'

Agreement, Serenic seeks damages against both Protean and Vanxay Kitnikone in his individual

capacity.  Defendants seek summary judgment on this issue and a dismissal of the contract

claims against Mr. Kitnikone in his individual capacity.

The Partner Agreement was made "by and between Serenic . . . and Protean

Technologies," and nothing in the Agreement indicates that Kitnikone is a signatory in his

---

[8]  As part of Serenic's objection to Protean's request for summary judgment on these
claims, it submitted a document titled "Objections to Evidence" (Docket No. 87) seeking to
strike information contained in the Kitnikone Affidavit.  Because the Court has not relied on any
of the challenged information in deciding the present motions, it is not necessary to specifically
address the objections.

**MEMORANDUM DECISION AND ORDER -12-**

personal capacity.  *See Kitnikone Affidavit*, Ex. A (Docket No. 84-3).  Further, the Partner

Agreement was signed by Kitnikone as "President" of Protean.  *Id.*   Finally, Jay Malik, president

of Serenic, acknowledged during his deposition that Kitnikone signed the Partner Agreement on

behalf of Protean.  *Cameron Affidavit*, Ex. 1, p. 220, l. 20 - p. 221, l. 14 (Docket No. 84-6).

For these reasons, and based on the evidence in the record, the Court finds, and thus

concludes, that Kitnikone cannot be directly liable under the Partner Agreement as a signatory to

the Agreement for any breach of the contract, including for a breach of the covenant of good

faith and fair dealing.  *See Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003); *Mackay v. Lay*,

470 P.2d 614, 616 (Colo. Ct. App. 1970) (determining that the "evidence is clear that plaintiff at

all times was dealing with the corporation and relied upon the corporation and not the individual

officer of the corporation for repayment," and noting that "[t]here was no privity between

plaintiff and defendant and no obligation on behalf of defendant to plaintiff"); *Paloukos v.*

*Intermountain Chevrolet Co.*, 99 Idaho 740, 742, 588 P.2d 939, 941 (Idaho 1978) (explaining

that "[i]n general, corporate officers are not individually liable for the contracts of the

corporation"); *Wing v. Martin*, 107 Idaho 267, 272, 688 P.2d 1172, 1177 (1984) (stating "[i]t is

axiomatic in the law of contract that a person not in privity cannot sue on a contract")*; Goodson*

*v. American Standard Ins. Co. of Wis*., 89 P.3d 409, 414 (Colo. 2004) (explaining that in most

contractual relationships, a breach of the duty of good faith and fair dealing will only result in

damages for breach of contract and will not give rise to tort liability); *State Farm Mut. Auto. Ins.*

*Co. v. Brekke*, 105 P.3d 177, 188 (Colo. 2004) (noting that "[u]nlike the breach of the implied

duty of good faith and fair dealing in an ordinary contract, breach in an insurance contract gives

rise to a separate cause of action in tort").[9]

However, Kitnikone could be held personally liable for the acts and omissions of Protean if he is considered to be the alter-ego of Protean, as Serenic alleges in its Complaint. *Complaint*, p. 3, ¶ 10 (Docket No. 1).  Under Idaho law, a court may disregard a corporate entity (i.e., "pierce the corporate veil")[10] if there is "such a unity of interest and ownership that the separate personalities of the corporation and individual no longer exist," and if a showing is made that "if the acts are treated as those of the corporation, an inequitable result will follow or that it would sanction a fraud or promote injustice."  *Hutchison v. Anderson*, 130 Idaho 936, 940, 950 P.2d 1275, 1279 (Ct. App. 1997).

In making this determination, there are several factors to consider.  "For example, was the sole shareholder acting as president of the corporation; was there a lack of corporate formalities, such as directors' meetings; did the shareholders fail to submit corporate contract and inventory revisions to the board of directors; and were business transactions completed without approval by any director or officer of the corporation."  *Id.*  These factors, however, "are not exclusive because the conditions under which a corporate entity may be disregarded vary according to the circumstances of the case."  *Id.*

Serenic has presented evidence demonstrating that a unity of interest and ownership may

---

[9]  Serenic's reliance on a case allowing personal liability for corporate officers in relation to intentional torts is inapposite here because Kitnikone is seeking summary adjudication of his personal liability only with regard to the contract claims.  *See Serenic's Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment*, p. 12 (Docket No. 92); *see also PMC, Inc. v. Kadisha*, 93 Cal. Rptr. 2d 663, 670 (Cal. App. 2 Dist. 2000) (providing that "[c]orporate director or officer status neither immunizes a person from personal liability *for tortious conduct* nor subjects him or her to vicarious liability for such acts") (emphasis added)).

[10]  Piercing the corporate veil allows the fact finder to disregard the corporate form, thereby making individuals liable for corporate debts.  *VFP VC v. Dakota Co.*, 141 Idaho 326, 335, 109 P.3d 714, 723 (2005).

**MEMORANDUM DECISION AND ORDER -14-**

exist here.  Kitnikone and his wife are the sole shareholders and officers of Protean, an

S Corporation for which Kitnikone serves as president.  *Second Alexander Declaration*, Ex. 40,

p. 305 (Docket No. 89-10); *White Declaration*, Ex. 42, pp. 177, 182 (Docket No. 90).  *See, e.g.*,

*Hutchison v. Anderson*, 130 Idaho at 940, 950 P.2d at 1279 (noting when considering the unity

of interest requirement that the defendant was the president of the corporation and in complete

control of the corporation, and all of the shareholders were members of his immediate family).

Mr. Kitnikone testified at his deposition that he and his wife, as the sole officers of Protean, do

not hold annual meetings in a "formal fashion" and that they "mostly" do not take minutes of any

meetings.  *Second Alexander Declaration*, Ex. 40, p. 305 (Docket No. 89-10).  He also testified

that Protean does not have shareholder meetings in a "formal sense" and he does not recall if

they held a shareholder meeting in an informal sense.  *White Declaration*, Ex. 42, p. 200 (Docket

No. 90).  *See, e.g.*, *Hutchison v. Anderson*, 130 Idaho at 940, 950 P.2d at 1279 (explaining, as

part of the consideration to uphold the district court's finding of a unity of interest, that the

corporation had annual meetings but did not introduce minutes from those meetings into

evidence).

In addition, the agreements Kitnikone executed on behalf of Protean were not submitted

to the board of directors for approval and Kitnikone alone made decisions related to Protean's

business transactions.  *See, e.g.*, *First Alexander Declaration*, Ex. 27 at pp. 166-67 (Docket No.

83-3); *Second Alexander Declaration*, Ex. 40 at p. 311 (Docket No. 89-10).  Further, Kitnikone

has transferred a substantial amount of funds from his personal account to Protean and he made

the decisions regarding whether Protean would make payments to him on promissory notes

securing loans he made to Protean.  *Kitnikone Affidavit*, ¶¶ 14, 15; *Second Alexander*

*Declaration*, Exs. 40 & 41 (Docket Nos. 89-10 & 89-11); *White Declaration*, Ex. 42, pp. 188-91

**MEMORANDUM DECISION AND ORDER -15-**

(Docket No. 90).  However, because there is evidence in the record that Kitnikone and his wife may have complied with some corporate formalities, such as filing an annual report with the State of Idaho, *see Second Alexander Declaration*, Ex. 40, p. 305, but may have failed to comply with other requirements, there is a genuine issue of material fact as to unity of ownership.[11]

The second question relevant to the relief seeking to pierce the corporate veil is whether an inequitable result will follow, or whether it will promote injustice to treat Kitnikone's acts as those of Protean.  A corporation's financial condition may be considered as one factor when determining whether an injustice would occur by observing the corporate status.[12]  For example, in discussing the undercapitalization issue in *Ross v. Coleman Co.*, the Idaho Supreme Court noted that there was nothing in the record to "reflect that [the corporation] was inadequately capitalized and as a result could not respond to a judgment against it."  114 Idaho 817, 832, 761 P.2d 1169, 1184 (1988).  Indeed, the record in that case "affirmatively show[ed] that [the

---

[11]  Kitnikone averred that Protean, and its predecessor, Delta Management Group, Inc., have "observed the formalities of doing business as a corporation by holding regular meetings of the board of directors and shareholders, issuing stock, maintaining separate books and filing all necessary reports with the Idaho Secretary of State."  *Kitnikone Affidavit*, p. 1, ¶ 9 (Docket No. 84-3); *see also Memorandum in Support of Defendants' Motion for Partial Summary Judgment*, pp. 10-11 (Docket No. 84-2).  Because some of Kitnikone's statements conflict to a certain extent with his deposition testimony, the conflicting statements have not been relied on in evaluating Serenic's request to pierce the corporate veil.  For example, Kitnikone's deposition testimony indicates that Protean does not hold shareholder meetings.  *See White Declaration*, Ex. 42, p. 200 (Docket No. 90).  On the other hand, although Kitnikone stated the board of directors does not regularly hold formal meetings, he also testified that it does meet and that they do keep minutes for some meetings.  *White Declaration*, Ex. 42, p. 183 (Docket No. 90).

[12]  Although in the case relied on by Defendants, *Pierson v. Jones*, 102 Idaho 82, 84, 625 P.2d 1085, 1087 (1981), the Idaho Supreme Court stated that financial inadequacy is measured by the nature and magnitude of the corporate undertaking or the reasonableness of the cushion for creditors "at the time of the inception of the corporation," later decisions have considered the impact of a corporation's capitalization at the time of the lawsuit.  Moreover, the court in *Pierson* recognized that undercapitalization is just one factor "to be considered in determining whether or not to pierce the corporate veil."

**MEMORANDUM DECISION AND ORDER -16-**

corporation] has a net worth of several millions of dollars and could respond to any judgment rendered against it." *Id.* On this basis, the court determined that to recognize the corporate structure would not "sanction a fraud or promote injustice." *Id. See also, e.g., Hutchison*, 130 Idaho at 940, 950 P.2d at1279 (1997) (considering that the corporation "was undercapitalized and thus any attempt to collect on a judgment against it would probably be futile") (internal quotation marks omitted)); *Baker v. Kulczyk*, 112 Idaho 417, 420, 732 P.2d 386, 389 (Ct. App. 1987) (discussing an argument about whether defendant corporations may have sufficient worth to satisfy a judgment). Thus, the present capitalization of Protean may be relevant to the consideration of whether the corporate veil should be pierced.

Because there are facts indicating that Protean has been in financial trouble, *see e.g.*, *Second Alexander Declaration*, Ex. 40, p. 312 (Kitnikone's testimony that Protean is "still not making any money"); *First Alexander Declaration*, Ex. 27, p. 142 (testimony that Protean has not been current in its rent payments), and Kitnikone has provided funds to Protean, and based on the other facts set forth above, genuine issues of material fact exist as to whether he should be held liable for Protean's actions as the alter ego of Protean.[13] Thus, Defendants' motion for summary judgment on this issue is denied and the issue will be presented to the jury for determination.

---

[13] Although the parties urge the Court to decide the issue of piercing the corporate veil as a matter of law, the issue can be presented to a trier of fact to be decided. *See, e.g.*, *Maroun v. Wyreless Sys. Inc*., 141 Idaho 604, 114 P.3d 974 (2005) (discussing jury's determination, by special verdict, of whether a corporation was the alter ego of one of its shareholders and whether a failure to disregard the corporate form would result in injustice); *VFP VC v. Dakota Co.*, 141 Idaho 326, 335, 109 P.3d 714, 723 (2005) (finding that the district court properly allowed plaintiff to assert its theory under piercing the corporate veil to the jury); *Hutchison v. Anderson*, 130 Idaho 936, 940, 950 P.2d 1275, 1279 (Ct. App. 1997) (district court in a bench trial pierced the corporate veil and found defendant personally liable).

**MEMORANDUM DECISION AND ORDER -17-**

**D.      Protean's Trade Secret & Breach of Contract Counterclaims**

**(1)      The Alleged Misappropriation**

Protean's second counterclaim asserts that Serenic misappropriated Protean's "confidential information, namely the Stars interface system" and its third counterclaim alleges that Serenic "breached the Partner Agreement by misappropriating Protean's confidential information, namely the Stars interface system."[14]  *Answer & Counterclaim*, p. 11, ¶¶ 16, 19 (Docket No. 8).  According to the record, the STARS Interface system ("SIS") is a piece of software that performs a data interface functionality.  *See id.* at ¶ 5.  In effect, it allows software such as that developed by Serenic to interface with a software system called STARS that is used by some state agencies.  *See Cozakos Affidavit*, Ex. A, pp. 223-25, 290-94 & Ex. C, pp. 47-48 (Docket No. 86-2).  Serenic has requested summary judgment be granted in its favor on these counterclaims.

In opposing Serenic's request, Protean asserts that it "provided the source code to [the STARS] system to Serenic under the terms of the Partner Agreement and it was subject to the confidentiality clause of the Agreement."  *Defendants' Response to Plaintiff's Motion for Summary Judgment on Counterclaims*, p. 5 (Docket No. 86).  In its response brief, Protean cited to no evidence in the record to support this assertion.  On the other hand, there is evidence in the record demonstrating that Serenic never received any confidential SIS information.  Kitnikone, Protean's president, testified that he was not aware of anything in writing that shows Protean provided confidential information to Serenic concerning SIS, nor did anyone at Protean ever tell him that they had provided a copy of a demo of SIS to anyone at Serenic.  *Kitnikone Deposition*,

---

[14]  As set forth above, the Partner Agreement contains a clause protecting confidential information shared during the partnership and the breach of contract and trade secret claims therefore rely on the same facts and are properly considered together.

**MEMORANDUM DECISION AND ORDER -18-**

pp. 69-70 (Docket No. 83-2).  Further, Serenic provided evidence that it does not sell any product containing the SIS system nor has it demonstrated any SIS product.  *Serenic's Statement of Undisputed Facts*, ¶¶ 61-64 (Docket No. 66).

The only evidence on which Defendants rely to support their misappropriation claim is testimony indicating that a software demonstration to the Idaho Department of Transportation may have included Protean's SIS software.  *Defendants' Response to Plaintiff's Motion for Summary Judgment on Counterclaims*, p. 6 (Docket No. 86).  A review of the record reveals an affidavit that includes the testimony to which Defendants refer, however, it was not Serenic that demonstrated the product, but one of its partners, Easop Software Professionals, and it was a demonstration of how Serenic's product would "interface to the STARS system," and not necessarily a demonstration of Protean's software.  *Cozakos Affidavit*, Ex. A, p. 292 (Docket No. 86-2).

Despite this evidence, Jay Malik of Serenic testified that Serenic has something that allows its system to interface with the STARS system.  *Id.* at p. 290.  Malik explains that while Serenic does not have Protean's code in its possession, "anything Protean did to interface with STARS [by adding it to Serenic's 2.60 product] is derivative work of ours and belongs to us."  *Id.* at 291.  Thus, there is at least some evidence in the record that Serenic uses a system with some of its customers that interfaces with STARS and/or that Serenic views SIS as a derivative product that it has the right to use.  Moreover, Serenic has recently provided Defendants with the source code for the latest versions of its Navigator products, *see Serenic's Opposition to Motion to Augment*, p. 2 (Docket No. 114), and this could provide evidence to support Defendants' claims for misappropriation of trade secret and breach of contract.  Accordingly, with all of the conflicting or uncertain evidence in the record, summary judgment on these counterclaims is not

**MEMORANDUM DECISION AND ORDER -19-**

appropriate and Serenic's Motion should be denied, otherwise the Court would have to weigh

evidence, resolve disputes, determine credibility, and draw inferences not allowed when in

summary judgment proceedings.

**(2)      Defendants' Rule 56(f) Motion for Continuance & Motion to Augment**

Because genuine issues of material fact exist as to whether Serenic may have

misappropriated Protean's SIS software, Protean's Alternative Rule 56(f) Motion for

Continuance of the summary judgment proceedings (Docket No. 88) will be denied as moot.

Protean's motion in this regard was made "only in the event the Court should conclude the

evidence presented . . . is insufficient to establish a genuine issue of material fact." *Defendants'*

*Alternative Rule 56(f) Motion*, p. 2 (Docket No. 88).

Protean's request for a continuance is based on the same facts that support its request for

augmentation of the January 5, 2006 Order.  Protean refers the Court to an oversight in the

discovery dispute presented more than a year ago by way of motions to compel.  After

responding to an Order requiring the parties to meet, confer, and narrow the issues presented in

competing motions to compel, Defendants submitted that only certain requests remained at issue,

but through an oversight neglected to mention Request for Production 11.  This request sought

copies "of all demonstrations of Serenic Navigator 3.6 as set forth in your answer to

Interrogatory 19 above."  Because this request was not listed as one remaining at issue in the

parties' report, the January 5, 2006 Order on the motions to compel did not address whether

Serenic was required to comply with this production request.  (Docket No. 58).

Instead of submitting a motion for reconsideration, or otherwise bringing the oversight to

the Court's attention, Defendants waited more than six months after the Order was entered to

raise the issue in its present request for a continuance, and now seek to augment an Order entered

**MEMORANDUM DECISION AND ORDER -20-**

more than14 months ago.  In the court's view, because Serenic has now supplemented its

discovery responses, *see Serenic's Opposition to Motion to Augment*, p. 2 (Docket No. 114),

there is nothing before the Court  to compel production of at this time.  Accordingly, Protean's

Motion to Augment is moot and will be denied, without prejudice, unless the information

provided by Serenic is not fully responsive to the requested discovery.

**E.     Protean's Breach of the Covenant of Good Faith and Fair Dealing Counterclaim**

Serenic seeks summary judgment in its favor on Protean's counterclaim for breach of the

covenant of good faith and fair dealing.  Protean alleges that Serenic violated the covenant

"implied in the Partner Agreement . . . by deliberately undercutting Protean's proposals and

interfering with its attempts to market" Serenic's software under the Agreement and by

competing directly with Protean.  *Answer & Counterclaim*, p. 11, ¶ 13 (Docket No. 8).  The

competition complained of is Serenic's submission of a bid to Kent County, Michigan, in late

2002 for the sale of Serenic's software and Serenic's securing of the deal with Kent County.  *See*

*Churchill Declaration* (Docket No. 71).  However, the Partner Agreement provides:

> Serenic reserves the right to market products which are the same as
> or similar to the Serenic Products.  Serenic may market those
> products in the geographic areas serviced by Partner [Protean] and
> in other geographic areas.  Serenic may market those products
> directly, through other marketers, or through other types of
> distribution channels.

*Kitnikone Affidavit*, Ex. A, § 11.4 (Docket No. 84-3).

Thus, pursuant to the plain and unambiguous terms of the Partner Agreement, Serenic

was allowed to compete with Protean.  *See Grossman v. Columbine Med. Group, Inc*., 12 P.3d

269, 271 (Colo. App. 1999) (explaining that an implied covenant may not contradict terms or

conditions for which the parties have bargained); *Brimmer v. Union Oil Co. of Cal*., 81 F.2d 437,

440 (10th Cir. 1936) (stating that an "express covenant upon a given subject, deliberately entered

into without fraud or mutual mistake, excludes the possibility of an implied covenant of a different or contradictory nature").

Protean's counterclaim asserts that "[a]fter the Partner Agreement was executed, Serenic and Protean entered into an agreement, whereby Serenic agreed to give Protean a right of first refusal in all states" where the Stars interface system could be utilized. *Answer and Counterclaim*, p. 10, ¶ 6 (Docket No. 8).  However, Defendants have not submitted into the record any evidence to establish that such an agreement exists.

For example, Kitnikone testified that he did not recall having signed any writing to amend or modify the Partner Agreement. *Cozakos Affidavit*, Ex. C, pp. 41-44 (Docket No. 86-2). The Partner Agreement provides that it "may not be amended or modified except in a writing signed by the parties." *Kitnikone Affidavit*, Ex. A, § 11.9 (Docket No. 84-3).  Further, Kitnikone testified that it was an oral agreement for a right of first refusal and he thought it was Curtis Hopfenbeck who made the agreement. *Cozakos Affidavit*, Ex. C, pp. 41-44 (Docket No. 86-2). However, Hopfenbeck also testified that he thought it was Kitnikone or someone else who had entered into a right of first refusal agreement. *First Alexander Declaration*, Ex. 25, p. 103 (Docket No. 82-5).  A claim for breach of contract requires that the claimant first establish the existence of a contract. *See, e.g.*, *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  This, has not been established in the existing record.

In addition, the alleged oral agreement must be supported by consideration. *Industrial Prods. Int'l, Inc. v. Emo Trans, Inc*., 962 P.2d 983, 988 (Colo. App. 1997) (stating that an enforceable contract requires, among other things, "legal consideration"); *Hoagland v. Celebrity Homes, Inc*., 572 P.2d 493, 494 (Colo. App. 1977) (explaining that "[g]enerally, a modification to a contract requires consideration").  Defendants assert only that "this separate agreement was

**MEMORANDUM DECISION AND ORDER -22-**

supported by the consideration already given by both parties under the Partner Agreement."

*Defendants' Response to Plaintiff's Motion for Summary Judgment on Counterclaims*, p. 3

(Docket No. 86).  Accordingly, the alleged right of first refusal agreement must fail for lack of

consideration.

For all of the foregoing reasons, Serenic is entitled to entry of summary judgment on

Protean's counterclaim for breach of the covenant of good faith and fair dealing.

**F.      Serenic's Breach of Contract Claim Based on the Agreement to Arbitrate**

Serenic alleges that Protean breached Section 8.3 of the Partner Agreement providing for

arbitration of disputes as follows:

> Except for collection actions for payment of fees under this
> Agreement, any controversy or claim arising out of or relating to
> this Agreement or to its breach shall be settled by arbitration by a
> single arbitrator in accordance with Rules of the American
> Arbitration Association, pursuant to an arbitration held in Jefferson
> County, Colorado, and judgment upon the award rendered by the
> arbitrator may be entered in any court of competent jurisdiction.

*Kitnikone Affidavit*, Ex. A, § 8.3 (Docket No. 84- 3).  Both parties have requested summary

judgment on this claim.

Protean participated in arbitration proceedings with Serenic from July 2003 through May

2004, when the proceedings were suspended by the AAA because Protean failed to pay an

arbitration fee of $12,190.  *Kitnikone Affidavit*, ¶ 14-15 (Docket No. 84- 3); *Second Alexander

Declaration*, Ex. 33 (Docket No. 89-3).  Kitnikone averred that "[a]s a result of Protean's

inability to pay the invoice in the timeframe demanded, the AAA suspended the arbitration

proceedings."  *Kitnikone Affidavit*, ¶ 15 (Docket No. 84-3).  Serenic argues that Protean's failure

to pay the arbitration fee resulted in termination of the arbitration proceedings and breached the

parties' arbitration agreement.

**MEMORANDUM DECISION AND ORDER -23-**

In response, Protean counters by arguing that it was Serenic who actually terminated the arbitration proceedings, and that Protean never indicated to the arbitrator or Serenic that it was unwilling to go forward with the arbitration. *See Cameron Affidavit*, Ex. 2, p. 355 (Docket No. 85-2). Instead, *Serenic* terminated the arbitration by written notice dated August 16, 2004. *First Alexander Declaration*, Ex. 20 (Docket No. 80-3). Serenic's letter stated that "based on Protean's failure to meaningfully participate in the AAA arbitration and due to its failure to comply with the arbitration provisions in the Serenic Partner Agreement, Serenic has no choice but to submit this Notice of Termination." *Id.*

It is important to note, however, that Serenic's notice of termination was not provided until three months after the arbitrator had suspended the proceedings for Protean's non-payment of the required fees. *Cozakos Affidavit*, Ex. C (Docket No. 85-3). The arbitrator's suspension stated that it would "not effect a resolution of this matter, which may be resumed upon compliance with administrative requirements." *Id.* Because Protean's failure to pay precipitated the termination of the arbitration proceedings, Protean may be liable for breaching the arbitration clause.[15] On the other hand, because it was Serenic's letter that actually terminated the proceedings, a genuine issue of material fact exists as to whether or not Protean breached the arbitration agreement and, thus, a question of fact exists precluding summary judgment to either party on this particular claim.

---

[15] Additionally, Serenic has argued that Protean had access to funds to pay the AAA fee because Kitnikone put money into Protean before the May 14, 2004 suspension of the arbitration proceedings. *Serenic's Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment*, p. 15 (Docket No. 92); *Second Alexander Declaration*, Ex. 41 (Docket No. 89-11). If Protean had the money to pay the arbitration fee and chose not to, this could amount to a breach of the agreement settle any controversy or claims by arbitration.

**MEMORANDUM DECISION AND ORDER -24-**

# III.

# ORDER

In accordance with the foregoing, IT IS HEREBY ORDERED:

1.      Serenic's Motion for Summary Adjudication of Counts 1, 2, & 3 of the Protean

Counterclaim (Docket No. 65) is DENIED in part and GRANTED in part.  Serenic's

motion as to Protean's Counterclaim for breach of the covenant of good faith and fair

dealing is granted and that claim is dismissed.

Serenic's Motion is otherwise denied and Protean's remaining two counterclaims for

misappropriation of trade secret and breach of contract are not dismissed and will remain

for determination at trial.

2.      Serenic's Motion for Summary Adjudication on Liability Regarding Claims of

Misappropriation of Trade Secrets and Breach of Contract (Docket No. 68) is DENIED.

3.      Defendants'/Counterclaimants' Motion for Partial Summary Judgment (Docket No. 84)

is DENIED.

4.      Defendants'/Counterclaimants' Alternative Rule 56(f) Motion for Continuance (Docket

No. 88) is DENIED as moot.

5.      Defendants'/Counterclaimants' Motion to Augment Court's Order (Docket No. 110) is

DENIED without prejudice.

6.      A telephone scheduling conference is set for **May 3, 2007, at 9:30 a.m.** for the purpose

of setting a trial date.  Plaintiff's counsel shall initiate the telephone conference call to

(208) 334-1495.

**7.**     The Court intends to schedule this case for trial prior to September 21, 2007.

Accordingly, on or before May 2, 2007, counsel for each party shall file a written notice of dates between June 11, 2007 and September 21, 2007, when they are available for trial.  This notice shall include an estimate of the number of days each party anticipates it will need to present its case at trial.

DATED: April 26, 2007.

**Honorable Larry M. Boyle**
**U. S. Magistrate Judge**